## McFarland v. State Farm Mutual Automobile Insurance Co.

*Hy Mayerson* and *James R. Rosato,* for plaintiff.
*Mark C. Labrum,* for defendant.

HILL, *J.,* February 7, 1990 — The within matter was tried without a jury before the undersigned on January 4 and 5, 1990 for attorney fees claimed under the No-fault Motor Vehicle Insurance Act, 40 Pa.C.S. 1009.107(3), since repealed,* on the theory that defendant State Farm Mutual Automobile Insurance Company had refused to pay a "significant part" of certain benefits under plaintiff's policy "without reasonable foundation."

## FINDINGS OF FACT

(1) On July 21, 1984, plaintiff was involved in a traffic accident while operating her vehicle through an intersection in Philadelphia. Plaintiff's vehicle was hit on the driver's side and pushed to the curb so that the right back tire deflated. The vehicle then spun and hit a pole. Damage to plaintiff's vehicle was $2,686.39. The force of the impact caused plaintiff's seat belt to dig into the fabric of the seat. Plaintiff was taken to the Holy Redeemer Hospital for emergency treatment.

(2) On July 23, 1984, plaintiff was treated by her family physician (Dr. Malamut) who diagnosed "acute cervical, thoracic and lumbar strain as well as injuries to the left hip and chest."

(3) On July 31, 1984, plaintiff applied for first-party benefits under her No-fault Insurance Policy. In the application plaintiff described her injuries as "pain in chest and sternum and left hip and lumbosacral pain." There was no indication of any injury to plaintiff's mouth or teeth in this application.

---

* Plaintiff also claims attorney's fees under section 1009.107(1) but the court does not find this section applicable.

(4) Plaintiff was examined by Dr. John L. Sbarbaro, an orthopedist, on September 5, 1984 at which time he found "contusions of left hemathorax." Dr. Sbarbaro continued to treat plaintiff thereafter.

(5) On September 18, 1984, plaintiff was examined by Dr. Polakoff who had performed a cervical lamenectomy on her several years earlier. Dr. Polakoff diagnosed "thoracic and lumbar strain."

(6) On October 5, 1984, plaintiff was examined by Dr. William L. Robinhold, D.D.S., a dentist, who wrote her a letter on November 2, 1984 stating:

"The examination of X-rays of October 5, 1984 show a horizontal fracture of the upper left first bicuspid tooth and a horizontal incisor fracture of the upper left incisor tooth.

"Your dental examination of July 13, 1984 [prior to the accident] showed the teeth to be in normal condition, so I feel that the present fracture areas are definitely due to the automobile accident of July 24, 1984.

"The upper left central incisor can be completed by bonding. The upper left bicuspid will require root canal therapy and a porcelain gold crown."

(7) On December 7, 1984, plaintiff visited Dr. Robinhold for the second time and he performed a resin bonding of the upper left incisor and again recommended root canal of the bicuspid and thereafter a porcelain crown.

(8) Plaintiff forwarded the bill she received from Dr. Robinhold in the amount of $451 for the bonding of the incisor and X-rays to State Farm Mutual Automobile Insurance Company, her first-party carrier. This was received by State Farm prior to December 17, 1984, and was the first notice it had of any injury to plaintiff's mouth or teeth.

(9) On or after December 17, 1984, State Farm requested the dental X-rays which were received sometime in January 1985.

(10) Upon receiving the X-rays, State Farm retained Dr. Herbert B. Morgenroth, D.D.S. who reviewed the X-rays and wrote State Farm on or about February 26, 1985, as follows:

"Review of two periapical X-rays dated October 5, 1984, approximately three months post accident, indicate that the teeth for which treatment is requested appear to be extremely worn down. These teeth do not appear to be traumatically fractured. I note that there was [sic] no mouth or facial injuries as per your instructions and with the three-month delay in seeking dental treatment, it is my opinion that the treatment requested is necessary, however, not accident-related."

(11) In February 1985, plaintiff was examined by Dr. John R. Duda, M.D., an orthopedic surgeon, on behalf of State Farm. Dr. Duda's report dated February 25, 1985, recited a history and stated the following concerning his examination:

(a) She had "sudden bouts of very sharp expressions of pain causing sudden movements of the joints and back" [this probably should read "caused by" sudden movements of the joints and back].

(b) "Examination of the left sternum reveals no point tenderness but some diffuse tenderness in and about the distal left costochondral junctions."

(c) Examination of the back revealed "no point tenderness" but there was "some diffuse tenderness in and about thoracolumbar junction with no muscle spasm."

(d) "Diffuse tenderness in and about the left buttock."

(e) "Straight left raising test is negative to 90 degrees both in the sitting and supine positions."

(f) "Diffuse tenderness that seems to travel in location over the anterior left ilium."

(g) X-rays revealed "moderate degenerative changes in the lower lumbar spine."

(h) "My impression is that this lady sustained a contusion to the left sternum and a lumbosacral strain at the time of her accident. I see no evidence of a herniated disk, nerve root impingement or spinal stenosis . . . I see no reason to continue formalized physical therapy. I would recommend non-steroidal anti-inflammatory treatment combined with home exercises as needed, but see no reason why this patient cannot return to work at this time."

(12) On March 4, 1985, Dr. Lawrence K. Spitz, M.D., Medical Director of the Penn Executive Diagnostic Center Inc., issued his first report concerning his examination of plaintiff on behalf of State Farm which took place on February 25, 1985. Dr. Spitz set forth a history and found as follows:

(a) At the time of the examination plaintiff's major complaint was "at the left costochondral junction at approximately the fifth left rib."

(b) "Pain across her mid-back just below the bra strap line."

(c) "Pain over her left buttock down the posterior aspect of her left calf to just above the popliteal fossa."

(d) "Good range of motion of her neck."

(e) A "single minute area of tenderness on the fifth costochondral junction on the left to deep palpation."

(f) Palpation of her back reveals "no evidence of spasm of the thoracic muscles."

(g) "Lateral flexion and twisting are normal. Sitting root test and straight-leg raising are negative bilaterally. Reflexes in the lower extremities are within normal limits with no evidence of any muscle wasting in the lower extremities. Sensory examination is normal."

(h) "I find no objective evidence of any residual from the . . . accident of February 25, 1985. I see no reason why she cannot return to work in her full former capacity of private duty nurse with full lifting responsibilities . . . I also see no reason for

any further physical therapy. I did suggest that she remain on the Dolobid twice a day while she does some conditioning swimming . . . "

(13) By letter dated March 23, 1985, State Farm notified plaintiff that the $8,000 paid to date was all it would pay for loss of wage benefits under her policy and that further wage benefits would be refused based on the findings of Drs. Spitz and Duda.

(14) On March 28, 1985, plaintiff underwent a CAT scan which revealed a "mild to minimal disc protrusion at L4-5 and a possible large central disc herniation with evidence to the left side of L5-S1." The CAT scan had been ordered by Dr. Sbarbaro.

(15) By letter dated April 24, 1985, Dr. Sbarbaro wrote State Farm concerning plaintiff as follows:

"Subsequent to the report of January 18, 1985, this patient has continued to have complaints of pain in the left anterior chest wall as well as the lower back and left thigh. She has been seen in this office on February 19, March 26 and most recently, on April 11, 1985. A lumbar CAT scan . . . did demonstrate a small lumbar disc with some degenerative changes, however, I think that it is of minimal significance since a lumbar thermogram was also performed and found to be normal. I feel that this woman is just having a tough time getting rid of some minor residuals but they should clear up in the not too distant future. In the interim, she has been advised to use a back brace and apply heat to the affected areas."

(16) On July 11, 1985, Dr. Sbarbaro wrote Diane Martinelli, a legal assistant of counsel for plaintiff, concerning plaintiff as follows:

"This woman was in her usual state of good health until this accident of July 21, 1984 . . . Subsequent to that time, she has been seen in this office on many occasions with continuing complaints of chest pain as well as pain in the lower back and left hip. The symp-

toms in the back and left hip were of sufficient magnitude to make one wonder if she did, in fact, have a herniated lumbar disc and for that reason, the lumbar CAT scan was performed and this did demonstrate a small bulge at the 4, 5 level. Accordingly, a lumbar thermogram was performed in order to further evaluate the extent of the pathology and this study proved to be negative . . . it is hoped with time and rest that a full recovery will occur. I have had the opportunity to read reports from the Penn Diagnostic Clinic and my only comment there is that I place little value on them because this patient does, in fact, have degenerative changes of the lumbar spine and it is a well known fact that soft tissue injuries superimposed on a degenerative process only inflames the initial degenerative process.

"What we are dealing with here, is an acute strain and small disc problem in the lower back that is superimposed on a pre-existing yet asymptomatic, degenerative process and it is very common to see people with these symptoms drag on for months on end.

"This woman cannot work and would only suffer a major relapse if she was asked to go back and perform her usual nursing duties."

(17) Although there is no indication on exhibit D-9 that a copy was sent to State Farm, defendant did not deny at the trial that it had previous knowledge of this letter.

(18) In October 1985 plaintiff filed her first suit against State Farm because of the denial in March 1985 of further benefits.

(19) On November 14, 1985, State Farm agreed to pay an additional $6,000 in settlement of the first suit bringing the total payment of benefits by defendant to $12,368.85.

(20) The $6,000 paid in settlement of the first suit covered the following items:

$     400.00   Attorney's fee
    4,368.65   Additional wage loss
    1,231.35   Additional medical bills of Dr. Sbarbaro,
               Holy Redeemer Hospital and for a thermo-
               gram and a lumbar prosthesis and Holy
               Redeemer Hospital
$6,000        *Total*

(21) The State Farm claim activity log specifically states with regard to the payment of $6,000: "Attorney states he will accept $6,000 on (see above). This will not close."

(22) Following the agreement to pay an additional $6,000 on November 14, 1985, including additional wage benefits of $4,368.65, the maximum of $15,000 for wage loss benefits under the policy had still not been reached since the total amount paid was still $2,631.65 short of this cap.

(23) On March 14, 1986, defendant paid mileage costs to plaintiff totalling $81.60 which had been incurred up to that point.

(24) On March 25, 1986, State Farm paid plaintiff $296 for replacement services for help around the house.

(25) On June 12, 1986, State Farm made the last medical payment prior to the institution of the second suit (the case at bar) in May 1987.

(26) On July 15, 1986, plaintiff again visited Dr. Sbarbaro for treatment.

(27) Dr. Sbarbaro referred plaintiff to Edward H. McGehee, M.D., a professor of medicine at Thomas Jefferson University, because plaintiff had developed high blood pressure. Plaintiff was examined and treated for her blood pressure by Dr. McGehee on August 15, 1986 and September 3, 1986. On September 22, 1986, plaintiff also received injec-

tions from Dr. McGehee to relieve pain she was having in costal cartilages 3, 4 and 6 of her left ribs.

(28) On October 10, 1986, Dr. McGehee sent State Farm an attending physician's statement in which he diagnosed plaintiff's condition as "lumbar disc L4-5 disruption by auto wreck, parasternal cartilage tenderness." Dr. McGehee described plaintiff's history as "unable to work since auto collision July 21, 1984 — rib cartilage pains, back disrupted — lumbar disc — heart and chest symptoms not easily separated." Dr. McGehee also stated in the statement that he had treated plaintiff for "medicine adjustment for blood pressure and given her injections in her rib area."

(29) In his prognosis Dr. McGehee stated on the form "recurring low back problems, pains after use" and indicated that with reasonable medical probability the patient would continue to require care for "five to 10 years as a start."

(30) Dr. McGehee also noted on the form that "60 years' living probably had some effect on [her condition] but it functioned without pain until the accident."

(31) Prior to Dr. McGehee's report, State Farm was not aware of a problem with plaintiff's blood pressure but had reason to know of tenderness in the area of her chest. (See findings of fact 2, 3, 11(a), 12(a), 15, 16.)

(32) On October 27, 1986, Dr. Bruce J. Sailor, D.D.S., rendered root canal therapy to plaintiff, affixed a steel post with a composite build-up in her left bicuspid and submitted an attending physician's report to State Farm showing a charge of $515 for this work.

(33) Plaintiff had deferred treatment from Dr. Sailor due to her concern because she had previously had rheumatic fever which required her to take extra precaution in having this kind of dental

treatment performed on her. Plaintiff's high blood pressure also added to this concern.

(34) In December 1986 Dr. Duda examined plaintiff a second time on behalf of State Farm and his second report to Dr. Spitz, which is on the letterhead of Penn Diagnostic Center Inc., stated as follows:

(a) Plaintiff "has continued to complain of low back pain, more left sided than right with radiation down the left lower extremity, down the posterior aspect of the leg to the level of the knee but this is only on occasion. The back pain is worse than the leg pain."

(b) "Repeat examination again is similar to prior examination with no evidence of a herniated disc, nerve root impingement or spinal stenosis."

(c) "No evidence of any neurologic deficit."

(d) "Negative straight leg raising in the sitting position to 90 degrees, positive to left sided leg pain at approximately 80 degrees elevation on the left."

(e) "A report of a CAT scan . . . dated March 28, 1985 reads mild to minimal disc protrusion at L4-5 with the scan raising the question of a more prominent central disc protrusion at L5-S1, but scan artifact may be providing a positive false image. Please correlate."

(f) His impression was that she still had "signs and symptoms consistent with underlying degenerative joint disease" but "no evidence . . . of a herniated disc . . . My conclusion is unchanged and still see no reason from the orthopedic standpoint why this lady could not be gainfully employed on a full-time basis."

(35) In a second report dated December 12, 1986, Dr. Spitz reported to State Farm concerning his second evaluation of plaintiff on December 8, 1986 as follows:

(a) Effort causes pain in low back and down her left leg on lifting, straining or cleaning requiring bed rest for two to three days.

(b) On one occasion on bending to pick up an object she had a sharp pain in her left chest.

(c) A doctor at Jefferson [McGehee] has given her three injections of her costochondral junction with significant relief of the costochondritis from which she had been suffering.

(d) While the minimal pain in her chest did not really bother her she continued to complain of pain in her left low back down the left buttock and into the left posterior calf.

(e) A CAT scan showed "a small bulge at the L4-5 level which is not felt to be clinically significant" and she is taking Dolobid "on a regular basis."

(f) On examination no tenderness over the costo-chondral junctions and the muscles of the chest.

(g) On examination she moved easily. There was no evidence of any spasm of lumbar or paralumbar muscles.

(h) She did complain of tenderness over the left buttock.

(i) Measurement showed the left thigh 18 inches and the right 18 and one-half inches in circumference and her calves showed a difference of one inch between the left and right but no muscle weakness.

(j) She could sit on the examining table with her back vertical and her legs outstretched straight in front of her without discomfort for a significant period of time.

(k) Flexibility was good to 45 degrees but she then "stopped abruptly because of what she described as tightness and pain in her low back."

(l) No evidence of any residual from the accident and her CAT scan was "essentially negative."

(m) There was no evidence of "neurological deficit" and her "sitting root test and the ability to sit at 90 degrees on the examining table indicates, without question, that she has no sciatica."

(n) No motor weakness.

(o) There was "no need for further physical

therapy or medical evaluation . . . I see no reason why she cannot return to work . . . doing nursing activities, without restriction."

(36) On May 7, 1987, plaintiff instituted the second suit (the case at bar).

(37) On December 10, 1987, an arbitration panel awarded plaintiff $4,948.29 broken down as follows:

| | |
|---|---|
| The difference in wage loss benefits between $12,368.65 and the $15,000 cap | $2,631.65 |
| 18-percent interest on wage loss | 473.70 |
| Medical benefits (consisting of prescriptions and payment of bills of Drs. McGehee, Sbarbaro, Robinhold and Sailor) | 1.561.81 |
| 18-percent interest on medical benefits | 281.13 |
| *Total* | *$4,948.29* |

There was no award for attorneys fees at that time.

(38) Defendant appealed the arbitration award to the common pleas court based on the reports of Drs. Duda and Spitz.

(39) On October 6, 1989, the video deposition of Dr. McGehee was taken for use at the trial of this case.

(40) State Farm contends that prior to Dr. McGehee's deposition it did not understand the relationship between the treatment plaintiff received from Dr. McGehee for high blood pressure and the accident. It was Dr. McGehee's opinion that plaintiff's high blood pressure came from the medication she had received to reduce the symptoms caused by the accident. State Farm also contends that it was only as a result of the video deposition that it understood the relationship between the injections Dr. McGehee gave plaintiff in her rib cage and the accident. State Farm asserts that after learning this information defense counsel recommended payment for the treatment rendered

by Dr. McGehee which prior to that time did not appear to be related to the accident.

(41) Accordingly, on December 14, 1989, State Farm forwarded checks for the full amounts due Drs. McGehee ($371.32) and Sbarbaro ($246.45) to defense counsel who held them until trial commenced on January 4, 1990.

(42) On January 4, 1990, a settlement was agreed to between the parties as follows:

| | |
|---|---|
| State Farm to pay the entire balance due for prescriptions | $234.40 |
| State Farm to pay the entire balance due Dr. Sbarbaro | 246.45 |
| State Farm to pay the entire balance due Dr. McGehee | 371.32 |
| State Farm to pay 50 percent of the balance due the dentists totalling $771 | 385.50 |
| State Farm to pay 50 percent of the funds expended by plaintiff for household help which totalled $320 | 160.00 |
| State Farm to pay $2,500 of the outstanding balance claimed for wage loss which totalled $2,631.65 | 2,500.00 |
| Interest (In a conference call initiated by the court on February 2, 1990, counsel agreed that an error had been made in adding the components of the agreed settlement amount of $4,367.05 and that the sum of $469.38 should be designated as interest) | 469.38 |
| *Total* | *$4.367.05* |

(43) The difference between the amount awarded by the arbitration panel of $4,948.29 and the agreed settlement of $4,367.29 comes to $581.

(44) Accordingly, State Farm agreed to settle the claim for 88.26 percent of the award appealed from.

(45) The settlement did not include an award for attorneys' fees and it was agreed that this would be litigated.

(46) Defendant has posited its refusal to make settlement until after the video deposition of Dr. McGehee totally on its assertion that only then did it learn of the relationship between his treatment of plaintiff for her blood pressure and the accident and the relationship between the injections and the accident.

(47) While it is understandable why defendant refused to pay Dr. McGehee for his treatment of plaintiff for elevated blood pressure until after it had learned from his video deposition of the connection between the elevated blood pressure and the accident, defendant knew prior to the video deposition that following the accident plaintiff had been complaining of pain in her chest long before she first saw Dr. McGehee (finding of fact 31).

(48) The deposition of Dr. McGehee was not included in the evidence presented at the trial. There is, however, nothing in the notes of testimony of the trial which explains what information therein led State Farm to accept the injections Dr. McGehee gave plaintiff as related to the accident when it had not done so before.

(49) Similarly, there is nothing in the notes of testimony of the trial which would disclose what it was in Dr. McGehee's deposition which caused State Farm to agree to the balance of plaintiff's wage loss, the prescriptions and Dr. Sbarbaro's bill when it had not done so before.

(50) Under the circumstances the court must conclude that defendant's refusal to pay at an earlier date the amount which it agreed to settle the case for on January 4, 1990, was primarily a settlement strategy.

(51) While defendant is entitled to engage in any legitimate settlement strategy which it deems appropriate, defendant's strategy in this case required the law firm representing plaintiff to spend time in order to properly prepare plaintiff's case for trial.

(52) The court finds that defendant's refusal to pay the balance due Dr. Sbarbaro ($246.45), the balance due for prescriptions ($234.40), the amount due Dr. McGehee for injections administered to plaintiff ($46) and the balance due plaintiff for the difference in wage loss benefits between $12,368.65 and the $15,000 cap of the policy prior to the morning of trial (January 4, 1990) was "without reasonable foundation."

(53) The court finds that the refusal to pay the balance due on the bills of the two dentists was based on a "reasonable foundation."

(54) Accordingly, the court must find that State Farm's refusal to pay a "significant part" of the claim in question until the morning of the trial (January 4, 1990) was "without reasonable foundation" at least following the expiration of 30 days after the videotape deposition of Dr. McGehee which took place October 6, 1989.

(55) As a result of defendant's refusal to agree to pay a "significant part" of the claim "without reasonable foundation" until the morning of trial (January 4, 1990), counsel for plaintiff was obliged to expend a considerable amount of time to prepare her case for trial.

(56) The firm representing plaintiff did not keep time records in this case.

(57) The court finds a reasonable estimate of the time spent by counsel for plaintiff on this case to be as follows:

| Service | Partner Time | Associate Time | Paralegal Time |
|---|---|---|---|
| (a) Complaint | ½ | 1½ | 6 |
| (b) Depositions of plaintiff | 4 | ½ | — |
| (c) Response to answer | ½ | ½ | — |
| (d) Plaintiff's interrogatories to defendant (form) | — | — | ½ |
| (e) Preparation for arbitration | 2 | — | — |
| (f) Attended arbitration | 3 | — | — |
| (g) Review defendant's answers to interrogatories | — | ½ | — |
| (h) Plaintiff's answers to interrogatories (non-informative answers such as "see complaint") | — | — | ½ |
| (i) Prepare and attend video-tape deposition of doctor | 4 | — | — |
| (j) Motion to compel | 2 | — | — |
| (k) Correspondence | 1 | — | — |
| (l) Prepare for trial | 5 | 10 | — |
| (m) Trial | 14 | 10 | — |
| *Total* | 36 | 23 | 7 |

(58) Taking into consideration counsel's familiarity with the facts due to representation of plaintiff in the earlier suit for first-party benefits (See finding of fact 18) and a prior suit against the third-party tort-feasor involved in the accident, the degree of difficulty of the case and all the circumstances in question, the court finds that appropriate compensation should be set at the rate of $145 per hour for partner time ($5,220), $85 per hour for associate time ($1,955) and $45 per hour for paralegal time ($315).

(59) The court finds that plaintiff is entitled to $7,490 for counsel fees.

## CONCLUSIONS OF LAW

(1) Defendant refused to pay a "significant part" of certain first-party benefits owed to plaintiff under her no-fault insurance policy "without reasonable foundation."

(2) Plaintiff is entitled to reasonable counsel fees of $7,490 under the No-fault Motor Vehicle Insurance Act, 40 Pa.C.S. §1009.107(3), since repealed.

## ADJUDICATION

And now, February 7, 1990, following a trial of the matter before the court without a jury on January 4 and 5, 1990, the court awards plaintiff $7,490 for counsel fees under the No-fault Motor Vehicle Insurance Act, 40 Pa.C.S. §1009.107(3), since repealed.